UNITED STATES BANKRUPTCY COURT   **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
In re:           :
             :  Case No. 06-12128 (SMB)
COMPAÑÍA de ALIMENTOS FARGO, S.A., :  Involuntary Chapter 11
             :
     Alleged Debtor.   :
--------------------------------------------------------X

## MEMORANDUM DECISION GRANTING MOTION
## TO DISMISS THE INVOLUNTARY PETITION

**A P P E A R A N C E S**:

KIRKLAND & ELLIS LLP
Attorneys for Petitioning Creditors
153 East 53rd Street
New York, New York 10022

  David Eaton, Esq.
  Andrew G. Horne, Esq.
  Carl D. LeSueur, Esq.
   Of Counsel


SHEARMAN & STERLING LLP
Attorneys for Compañía de Alimentos Fargo, S.A.
599 Lexington Avenue
New York, New York 10022

  James L. Garrity, Jr., Esq.
  Lynette C. Kelly, Esq.
   Of Counsel


PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Attorneys for Pierre Acquisition, LLC, Bismark
 Acquisition, LLC and Madera, LLC.
1285 Avenue of the Americas
New York, NY 10019

  Alan W. Kornberg, Esq.
  Brian S. Hermann, Esq.
   Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge**

The alleged debtor, Compañía de Alimentos Fargo, S.A. ("Fargo"), is an Argentine company.  Since 2002, it has been pursuing a <u>concurso preventivo</u> (the "<u>Concurso</u>"), a reorganization proceeding, in Argentina.  Argo Capital Investors Fund SPC, Rainbow Global High Yield Fund, Rainmac Fund and the Star Fund (collectively, the "Petitioners"), off-shore investors, hold approximately 65% of Fargo's public debt. Dissatisfied with the progress of the <u>Concurso</u> and some of the rulings made by the Argentine courts, the Petitioners filed this involuntary chapter 11 petition on September 11, 2006.

Fargo filed a motion to dismiss the petition on various grounds, including 11 U.S.C. § 305(a)(1).  The Court converted that portion of the motion to one for summary judgment, and for the reasons that follow, now grants the motion and dismisses the involuntary petition.

## BACKGROUND

**A.    Introduction**

Fargo and its five wholly owned subsidiaries constitute Argentina's largest commercial producer and packager of bread and bread products.  (<u>Declaration of Hernán Gestoso</u>, sworn to Nov. 29, 2006 (the "<u>Gestoso Decl.</u>") at ¶ 2.) (ECF Doc. # 30.)  In 2005, Fargo controlled approximately 63.08% of the total Argentine packaged bread market (<u>id.</u> at ¶ 10), and earned net revenues of approximately U.S. $66.2 million. (<u>Id.</u>)

Its operations are centered in Argentina.[1]  Fargo employs 1300 employees, all of whom work in Argentina (id. at ¶ 11), and neither Fargo nor any of its five wholly owned subsidiaries has employees or operations outside of Argentina.  (Id. at ¶ 2.)  Fargo has approximately 700 customers, 98% of which are located in Argentina.  (Id. at ¶ 13.)  During its fiscal year 2005, 97.38% of its sales were made to domestic customers.  All but two of its twenty largest customers are located in Argentina, and those two are domiciled in Chile and Cuba, respectively.  (Id.)  As of December 2005, Fargo had approximately 1170 suppliers, only twelve of whom were located outside of Argentina.  (Id. at ¶ 14.)  Fargo's assets in the United States consist of a single trademark and three pending trademark applications.  (Id. at ¶ 18.)

Fargo's equity is currently held by Fargo Holding Gibraltar ("FHG"), a Gibraltar company that is not subject to the jurisdiction of this Court. (Supplemental Declaration of Dr. Javier Lorente, sworn to Mar. 14, 2007 (the "Supp. Lorente Decl.") at 15 n.5)  (ECF Doc. # 53.)  Pierre Acquisition LLC ("Pierre") owns FHG (id.) and Pierre is 70% owned by Madera LLC ("Madera") and 30% owned by Grupo Bimbo S.A. de C.V. ("Grupo Bimbo").

Fargo's debt consists of (i) general unsecured trade debt; (ii) unsecured notes; (iii) special secured debt, and (iv) general secured debt.  (Gestoso Decl. at ¶¶ 19-21.)  The unsecured notes (the "Notes"), in the face amount of US $120,000,000, were issued under United States law pursuant to an indenture agreement (the "Indenture") dated

---

[1]     Fargo has also moved to dismiss this involuntary case for lack of personal jurisdiction.  The discussion that follows is not intended to constitute a finding on that issue.  Some of the same facts are nevertheless germane to the question of abstention, and the Petitioners have not offered contrary facts or sought discovery pursuant to FED. R. CIV. P. 56(f).

July 27, 1998, with Citibank, N.A., as Trustee (the "Indenture Trustee"). (Id. at ¶ 19 & Ex. A.) The Indenture calls for semi-annual interest payments to noteholders (the "Noteholders") and repayment of the principal amount in 2008. (Id. at ¶ 20.) Panificación Argentina S.A. ("Panificación"), a Fargo subsidiary, guaranteed the Indenture debt. (See id. at ¶ 31.)

Bismark Acquisition, LLC ("Bismark"), an affiliate of Pierre, holds Fargo's senior secured debt -- US $31,690,833. (Declaration of Andrew Horne, sworn to Feb. 14, 2007 (the "Horne Decl.") Ex. C at 26) (ECF Doc. # 46.) The senior secured debt is secured by first priority liens on (1) 99.99% of FHG's shares in Fargo; (2) 99.99% of Fargo's shares in Panificación and two other subsidiaries, Capital Foods S.A. ("Capital Foods") and Fresh Food S.A.; (3) trademarks held by Fargo, Panificación and Capital Foods; (4) machinery owned by Fargo and Panificación (up to US $18,000,000 plus interest); and (5) mortgages on real property owned by Fargo and Panificación. (Gestoso Decl. at ¶ 22.) On March 29, 2006, ABN AMRO, the collateral agent for Bismark, notified Fargo that it would commence the foreclosure and auction of certain assets within 60 calendar days. (Id. at ¶ 49.) Fargo and Bismark have entered into several forbearance agreements, and it appears that the current one expires in December 2007.

B.    **The Concurso**

Following Argentina's delinking of the dollar-to-peso exchange rate in early 2002, the value of the peso fell, plunging the Argentine economy into a recession. (Gestoso Decl. at ¶ 23.) In February 2002, Fargo defaulted on US $7,950,000 of interest payments due to the Noteholders (id. at ¶ 20), and on June 28, 2002, Fargo filed a petition requesting protection in the form of a concurso preventivo under Argentine Insolvency

4

Law in the National Commercial Court in the City of Buenos Aires.  (Id. at ¶ 27.)
Panificación subsequently filed a petition for a concurso preventivo, and Panificación and
Fargo's proceedings have been consolidated.  (Id. at ¶ 28.)  On August 13, 2002, the
Argentine bankruptcy court rendered a judgment that, among other things, declared
Fargo's Concurso open, and appointed a General Trustee (or General Receiver) and an
Allowing Trustee (or Allowing Receiver).  The Allowing Trustee was charged with the
duty to administer the claims process.  (Id. at ¶ 27.)

The commencement of the Concurso triggered a statutory automatic stay.  The
stay prohibited actions and proceedings against Fargo and its property, wherever located;
prevented creditors from attaching or interfering with Fargo's assets; and precluded
Fargo from paying unsecured claims subject to the Concurso, except pursuant to an
approved plan.  (Declaration of Dr. Javier Lorente, sworn to Nov. 29, 2006 (the "Lorente
Decl.") at ¶ 10) (ECF Doc. # 31.)  Secured creditors with a mortgage or pledge of Fargo's
assets were exempt from the stay, and could foreclose at any time during the Concurso
provided they filed a proof of claim in the Concurso.  (Id. at ¶ 11.)  Bismark's
predecessor and assignor, Deutsche Bank, had filed proofs of claim against Fargo and
Panificación before assigning its interests to Bismark (Gestoso Decl. at ¶ 30) and, over an
objection, the Argentine bankruptcy court determined that Deutsche Bank held valid
secured claims against both Fargo (US $31,690,333.93) and Panificación (US
$32,524,799.50).  (Id. at ¶ 34, Ex. C & Ex. D.)

## C.    The Litigation Between the Debtors and the Noteholders

The source of the Petitioners' discontent can be traced to a decision by an
Argentine appellate court regarding the Indenture Trustee's voting rights.  By way of

background, the Indenture Trustee filed aggregate proofs of claim on behalf of all Noteholders against Fargo and Panificación in the full amount of the principal and unpaid pre-petition interest.  Several Noteholders also filed their own claims.  (Gestoso Decl. at ¶ 31.)  Fargo and Panificación objected to the claims, and Fargo commenced an ancillary proceeding to limit the claims for voting and distribution purposes.  (Id. at ¶ 32 & Ex. B.)  Fargo contended that (1) Argentine law should be applied when determining issues relating to the Notes, (2) the liabilities under the Notes should be converted from dollars to pesos, and (3) the amounts paid for the Notes in the secondary market by the Noteholders, rather than the principal amount of the Notes, should be recognized for voting and distribution purposes.  (Id. at ¶ 32 & Ex. B.)

The Indenture Trustee prevailed in the Argentine bankruptcy court, which allowed its proofs of claim against Fargo (US $134,872,628.13) and Panificación (US $139,841,144.32).  Thus, it rejected Fargo's argument that the debt should be converted from dollars into pesos, and agreed with the Indenture Trustee that the claims should be calculated, for voting and distribution purposes, based on the face amount of the Notes plus the interest accrued up to the date that each petition was filed.  Finally, the court disallowed the claims asserted by the individual Noteholders.  (Id. at ¶ 34.)  Fargo filed a "nullity motion" in the Argentine bankruptcy court, in effect, asking that court to reconsider its earlier decision. (Transcript of hearing held June 12, 2007 ("Tr.") at 6.)  The Argentine bankruptcy court denied the nullity motion, and in October 2003, Fargo appealed the denial to the National Court of Appeals in Commercial Matters (the "Court of Appeals").  (Gestoso Decl. at ¶¶ 34-35; Tr. at 7.)   The Concurso was stayed pending appeal.  (Gestoso Decl. at ¶¶ 36, 42; Declaration of Dr. Ariel Angel Dasso, sworn to Feb.

14, 2007 (the "Dasso Decl.") at ¶ 35 (ECF Doc. # 44); Supplemental Declaration of Dr.

Ariel Dasso, sworn to Apr. 26, 2007 (the "Supp. Dasso Decl.") at ¶ 3, Petitioners' Rule

7056-1 Counter-Statement of Undisputed Fact, dated Apr. 27, 2007 at Ex. A) (ECF Doc.

# 64.))

The Court of Appeals reversed on March 4, 2005 (the "March 4, 2005 Ruling"),

and in doing so, decided an issue that apparently was neither argued nor briefed.

Although the Court of Appeals agreed that the Notes should be denominated in dollars, it

limited the Indenture Trustee's claim, for voting purposes, to the amount of unpaid pre-

petition interest.  (Gestoso Decl. at ¶ 37 & Ex. E; Dasso Decl. at ¶ 41.)  Thus, although

the Indenture Trustee's claims in the Fargo and Panificación cases remained fixed at US

$134,000,000 and US $139,000,000, respectively, for distribution purposes, the Court of

Appeals reduced each claim by US $120,000,000 for voting purposes.  (Tr. at 8.)

The Petitioners claim that Fargo did not present this argument to the Court of

Appeals, and the Indenture Trustee never had the opportunity to be heard on this issue.

(Horne Decl. Ex. A at 17-18.)  Indeed, Fargo conceded at the June 12, 2007 hearing "that

there were some procedural problems" with how the Court of Appeals reached its

decision.  (Tr. at 8.)

The Indenture Trustee filed a motion for clarification of the March 4, 2005

Ruling, but the motion was denied.  (Gestoso Decl. at ¶ 38; Dasso Decl. at ¶ 52.)  The

Indenture Trustee then filed a motion for leave to file "extraordinary appeals" before the

National Supreme Court (the "Supreme Court"), and also filed a general motion for

appeal in the Supreme Court.[2]  (<u>Gestoso Decl.</u> at ¶ 38.)  Its request for an "extraordinary appeal" was rejected, but only with respect to Panificación. Its requests for a general appeal and an "extraordinary appeal" in the Fargo bankruptcy were still pending when the involuntary petition was filed.  (<u>Gestoso Decl.</u> at ¶ 39; <u>Supp. Dasso Decl.</u> at ¶ 6; <u>Dasso Decl.</u> at ¶ 54.) [3]

There the matter stood for two years.  Perhaps impelled by the pendency of this proceeding, Fargo began taking steps to reinstate the <u>Concurso</u>.  On March 6, 2007, Fargo filed a waiver/abidance motion (the "Waiver") with the Court of Appeals, stating that it would agree to allow the Indenture Trustee to vote the full value of the claims, and seeking to reinstate the <u>Concurso</u>.  (<u>Supp. Lorente Decl.</u> at ¶ 9 & Ex. B.)  The Indenture Trustee supported reinstatement of the <u>Concurso</u> and the Waiver, but requested that the Argentine bankruptcy court rule on the Waiver.  (Tr. at 10-11.)  The Indenture Trustee expressed concern, <u>inter alia</u>, about the validity and service of the Waiver.  (<u>Id.</u>; Transcript of hearing held August 27, 2007 ("Tr. (8/27)") at 4-5) (ECF Doc. # 79.)  The General Trustee opposed the Waiver because, <u>inter alia</u>, it would prejudice the voting rights of the other creditors.  (<u>See</u> <u>Second Declaration of Carl D. LeSueur in Opposition to Motion of</u> Compañía <u>de Alimentos Fargo, S.A. to Dismiss the Involuntary Chapter 11 Petition</u>, sworn to Oct. 8, 2007 (the "<u>Second LeSueur Decl.</u>") at Ex. 2) (ECF Doc. # 82.)

---

[2]       "An ordinary appeal and an extraordinary appeal can be filed before the Highest Court.  An ordinary appeal is filed to the Supreme Court whenever the Nation is a direct or indirect party to the case.  An extraordinary appeal is filed against final judgments rendered by appellate, provincial, or national courts."  (<u>Dasso Decl.</u> at ¶ 33.)

[3]       The Supreme Court had remitted the complaint associated with this matter to the Attorney General for a recommendation.  (<u>Gestoso Decl.</u> at ¶ 41; <u>Supp. Dasso Decl.</u> at ¶ 8.)

By order dated August 21, 2007, the Supreme Court agreed that the issues raised by the Waiver should be remanded to the Argentine bankruptcy court.  The Supreme Court directed the appellant (the Indenture Trustee) to inform it every three months about the progress in the case, and whether it was still interested in pursuing the petition.  (Fifth Declaration of Lynette C. Kelly in Support of Motion of Compañía de Alimentos Fargo, S.A. to Dismiss Involuntary Chapter 11 Petition, sworn to Aug. 23, 2007 at Ex. A) (ECF Doc. # 76.)  One day later, the bankruptcy court acknowledged the remand.  (Sixth Declaration of Lynette C. Kelly in Support of Motion of Compañía de Alimentos Fargo, S.A. to Dismiss Involuntary Chapter 11 Petition, sworn to Aug. 24, 2007 at Ex. A) (ECF Doc. # 77.)  The parties disagree about the significance of these recent events, but even counsel to the Petitioners agreed that it is a "good development."  (Tr. (8/27) at 13.)

By order dated September 11, 2007, the Argentine bankruptcy court took the first steps required by the Supreme Court's mandate. It resumed (i.e. reinstated) the Fargo and Panificación bankruptcy cases, and consolidated the two cases for the purpose of deciding the validity of the Waiver.  It also directed the debtors to publish notice of the resumption of the cases, and ordered that notice of the proposed Waiver and the Indenture Trustee's answer be given to the Trustees in each case, the members of the creditors' committees and the State Attorney's Office.  (Seventh Declaration of Lynette C. Kelly in Support of Motion of Compañía de Alimentos Fargo, S.A. to Dismiss Involuntary Chapter 11 Petition, sworn to Sept. 26, 2007 at Ex. A) (ECF Doc. # 80.)  The General Trustee and the Allowing Trustee have since filed papers opposing the Waiver. Both argued, inter alia, that the Waiver would adversely affect the voting rights of the other creditors.  (See Second LeSueur Decl. at Ex. 3 & Ex. 4.)

9

D.      **The Involuntary Petition**

While these events were transpiring in Argentina, the Petitioners filed the involuntary petition in this Court on September 11, 2006.  According to the Involuntary Petition, the Star Fund and the Rainbow Fund are located in the Bahamas, Argo Capital is located in the Cayman Islands, and Rainmac is located in the British Virgin Islands.  (See Involuntary Petition, dated Sept. 11, 2006) (ECF Doc. # 1.)

The Petitioners simultaneously filed an application pursuant to Federal Bankruptcy Rule 2004.  (Motion of Petitioning Creditors to Conduct 2004 Examinations, dated Sept. 11, 2006 (the "2004 Application")) (ECF Doc. # 2.)  The 2004 Application sought authority to examine Fargo, Grupo Bimbo, Fernando Chico Pardo (a Mexican investor), Pierre, Bismark, Promecap S.A. de C.V. (an entity allegedly owned by Pierre and Bismark), Sanalp 2005 S.L. (a Spanish LLC 70% owned by Madera) and Madera.  (2004 Application at ¶ 20.)[4]  The Petitioners contended that Grupo Bimbo, a Fargo competitor, and Chico Pardo acted to seize control of Fargo by purchasing, directly or indirectly, Fargo's senior secured debt and equity.  (Id. at 2.)  In doing so, Grupo Bimbo and Chico Pardo were allegedly able to gain control over the Concurso, and rather than maximize the estate for all creditors, disenfranchised the Noteholders and robbed Fargo's creditors of the value of the estate.  (See id. at ¶ 12.)  According to the Petitioners, "such actions strongly support claims of, inter alia, equitable subordination, breach of fiduciary duty, corporate veil piercing and other lender liability actions against Chico Pardo, Grupo Bimbo, Bismark Acquisition, Pierre Acquisition and their proxies" (id. at ¶ 16), and the

---

[4]        Sanalp is an affiliate of Madera, Chico Pardo and Grupo Bimbo.  In September 2005, it made a tender offer for Fargo's public debt.  A copy of the tender offer is attached to the Horne Decl. as Exhibit C.  According to the Petitioners, the tender offer violated Argentine law.  (Dasso Decl. at ¶ 39.)  Fargo's expert disagrees.  (Supp. Lorente Decl. at ¶ 7.)  Sanalp withdrew the tender offer in December 2005.

2004 Application was filed to assist the Petitioners to bring such claims. (Id.) Fargo, Pierre, Bismark and Madera objected to the relief, and the Petitioners subsequently withdrew the 2004 Application. (Withdrawal of Motion of Petitioning Creditors to Conduct 2004 Examinations, dated Feb. 21, 2007) (ECF Doc. # 51.)

## DISCUSSION

Section 305(a)(1) states:

(a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if –

(1) the interests of creditors and the debtor would be better served by such dismissal or suspension.

The decision to abstain, either by suspension or dismissal, is committed to the Court's discretion. GMAM Inv. Funds Trust I v. Globo Comunicacoes E Participacoes S.A. (In re Globo Comunicacoes E Participacoes S.A.), 317 B.R. 235, 255 (S.D.N.Y. 2004) ("Globopar"); In re Bd. of Dirs. of Multicanal S.A., 314 B.R. 486, 520 (Bankr. S.D.N.Y. 2004) ("Multicanal"), aff'd in part and remanded in part on other grounds, 331 B.R. 537 (S.D.N.Y. 2005); Matter of Fitzgerald Group, 38 B.R. 16, 17 (Bankr. S.D.N.Y. 1983); 2 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 305.01 at 305-2 (15th ed. rev. 2007).   The court's discretion is generally informed by several factors, including  (1) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (2) economy and efficiency of administration; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving an equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6)

whether a non-federal insolvency has proceeded so far that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought.  See In re Paper I Partners, L.P., 283 B.R. 661, 679 (Bankr. S.D.N.Y. 2002); accord In re Mt. Dairies, Inc., 372 B.R. 623, 635 (Bankr. S.D.N.Y. 2007); In re Euro-American Lodging Corp., 357 B.R. 700, 729 (Bankr. S.D.N.Y. 2007); In re 801 S. Wells St. Ltd. P'ship, 192 B.R. 718, 723 (Bankr. N.D. Ill. 1996).

Although abstention under § 305 is considered an extraordinary remedy, see Paper I Partners, 283 B.R. at 678; In re RCM Global Long Term Capital Appreciation Fund, Ltd., 200 B.R. 514, 525 (Bankr. S.D.N.Y. 1996), the pendency of a foreign insolvency proceeding alters the balance by introducing considerations of comity into the mix.  The Second Circuit, in this regard, has frequently underscored the importance of judicial deference to foreign bankruptcy proceedings.  See, e.g., Finanz AG Zurich v. Banco Economico S.A., 192 F.3d 240, 246 (2d Cir. 1999); Maxwell Commc'n Corp. v. Societe Generale (In re Maxwell Commc'n Corp.), 93 F.3d 1036, 1048 (2d Cir. 1996); Allstate Life Ins. Co. v. Linter Group Ltd., 994 F.2d 996, 999 (2d Cir. 1993); Cunard S.S. Co. v. Salen Reefer Servs. AB, 773 F.2d 452, 458 (2d Cir. 1985).  "[D]eference to foreign insolvency proceedings will, in many cases, facilitate 'equitable, orderly and systematic' distribution of the debtor's assets."  Maxwell Commc'n Corp., 93 F.2d at 1048 (quoting Cunard S.S. Co., 773 F.2d at 458); accord JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V., 412 F.3d 418, 424 (2d Cir. 2005) ("We have repeatedly held that U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding . . . .  In such cases, deference to the foreign

court is appropriate so long as the foreign proceedings are procedurally fair and (consistent with the principles of Lord Mansfield's holding) do not contravene the laws or public policy of the United States."); <u>Finanz AG Zurich</u>, 192 F.3d at 246 ("We have repeatedly noted the importance of extending comity to foreign bankruptcy proceedings. Since '[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding,' American courts regularly defer to such actions.") (quoting <u>Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.</u>, 825 F.2d 709, 713-14 (2d Cir. 1987); <u>Cunard S.S. Co.</u>, 773 F.2d at 458 ("American courts have consistently recognized the interest of foreign courts in liquidating or winding up the affairs of their own domestic business entities.")

Where the bankruptcy court is asked to abstain in favor of a foreign proceeding, it must satisfy itself that the foreign forum will determine and adjust the parties' rights in a fair and equitable manner.  This question is of paramount importance, and subsumes factors 1, 3 and 4, discussed above.  If satisfied, the court must weigh the relative benefits and burdens of exercising its jurisdiction.  Factors 2 and 6 reflect these concerns.  Since there is no possibility of an out-of-court workout (factor 5), the last consideration in this case relates to the reason for filing the involuntary petition (factor 7).

## A.      The Argentine Insolvency Law and System

The evidence submitted by Fargo satisfies any burden it may bear to show that the Argentine insolvency system is procedurally and substantively fair, and provides a suitable forum to adjust the rights of the parties.  The <u>concurso preventivo</u> is similar to a chapter 11 case in the United States.  <u>In re Bd. of Dirs. of Compañía General de Combustibles S.A.</u>, 269 B.R. 104, 107 (Bankr. S.D.N.Y. 2001).  The debtor remains in

possession subject to the supervision of a court-appointed trustee and the oversight of a creditors committee.  As noted, an automatic stay prohibits the general creditors from taking actions against the debtor and its assets, and also prohibits the debtor from paying its pre-petition debts.  Argentine law provides for the filing and determination of claims, classification and priority of claims, the filing of an <u>acuerdo preventivo</u> (or plan of reorganization), objections to the <u>acuerdo preventivo</u> (including the right to discovery), the voting on the <u>acuerdo preventivo</u>, judicial approval and appellate review.  If the debtor's creditors reject the debtor's plan, a third party can file a plan that strips the debtor's shareholders of their equity interests.  <u>See</u> <u>generally</u> <u>Lorente Decl</u>. at ¶¶ 3-56; <u>Dasso Decl.</u> at ¶¶ 1-34; <u>Bd. of Dirs. of Compañía General de Combustibles S.A.</u>, 269 B.R. at 107-08.

Argentine law also provides additional protections to creditors.  The court can avoid fraudulent transfers and preferences.  (<u>Lorente Decl.</u> at ¶¶ 58-59.)  Argentine law imposes fiduciary duties on corporate officers and directors, recognizes a cause of action for breach of fiduciary duty, and grants third parties standing to enforce those duties.  (<u>Id.</u> at ¶¶ 60-63.)  In addition, Argentine securities laws impose a duty of loyalty on issuers of securities.  (<u>Id.</u> at ¶ 61.)  The duty of loyalty prohibits the wasting or usurpation of assets, and imposes a duty to act within the restraints of the law and corporate bylaws and in the company's best interest.  (<u>Id.</u> at ¶ 61.)  If his conduct is challenged, the officer or director has the burden to show that he has complied with the law.  (<u>Id.</u> at ¶ 61.)  The Argentine Criminal Code provides for sanctions against the members of the board of directors, senior management and comptrollers of a corporation later subject to liquidation, if such person willfully misrepresented the debts or expenses, failed to justify the transfer or

existence of assets or properties, fraudulently deposited assets belonging to the estate, or created illegal preferences in favor of any creditor.  (Id. at ¶ 62.)  Given this structure, it is not surprising that other courts in this district have granted comity to Argentine bankruptcies even though Argentine bankruptcy law is not identical to our own.  See, e.g., The Argo Fund Ltd. v. Bd. of Dirs. of Telecom Argentina, S.A. (In re Bd. of Dirs. of Telecom Argentina, S.A.), No. 06 Civ. 2352 (NRB), 2006 WL 3378687 (S.D.N.Y. Nov. 20, 2006); Argentinian Recovery Co. LLC v. Bd. of Dirs. of Multicanal S.A., 331 B.R. 537 (S.D.N.Y. 2005); Bd. of Dirs. of Compañía General de Combustibles S.A., 269 B.R. 104.

The Petitioners nevertheless challenge the fairness and efficiency of the Argentine bankruptcy system and the Argentine judiciary.  Their main source of contention is the March 4, 2005 Ruling.  Indeed, Fargo has conceded certain procedural irregularities, and its own expert has acknowledged that the appellate ruling suffers from "flaws".  (Supp. Lorente Decl. at ¶ 8.)  In short, many seem to agree that the Court of Appeals made procedural and substantive mistakes.

Assuming the critics are right, a mistake does not automatically imply partiality, or worse, corruption.  Courts often make mistakes, and in this case, the aggrieved party - - the Indenture Trustee -- has exercised its right to judicial review by appealing to the Supreme Court.  No one has ever suggested that the Argentine Supreme Court will perpetuate a clear error made by the lower court.  In addition, Fargo has agreed to waive the voting rights ruling, and allow the Indenture Trustee to vote the full amount of the debt.  In late August of this year, the Supreme Court remanded the proceedings to the Argentine bankruptcy court to hear any objections to, and rule on the validity of, the

Waiver, a process now under way. Fargo's expert concedes that there is no guarantee that the Argentine bankruptcy court will uphold the Waiver (Supp. Lorente Decl. at ¶ 9), and the General and Allowing Trustees have opposed it. If the Waiver is rejected, the Indenture Trustee retains its appellate rights in the Supreme Court under the remand order.

The Petitioners also maintain, more generally, that the Argentine judicial system is corrupt. State Department reports are admissible to prove foreign judicial corruption if the reports contain factual findings that are based upon an investigation made pursuant to legal authority. Bridgeway Corp. v. Citibank, 201 F.3d 134, 143 (2d Cir. 2000) (relying on a "Country Report"); Fox v. Bank Mandiri (In re Perry H. Koplik & Sons, Inc.), 357 B.R. 231, 241 (Bankr. S.D.N.Y. 2006) (same); FED. R. EVID. 803(8)(C). The Petitioners have submitted two extracts from the United States Department of State's web site. (See Declaration of Carl D. LeSueur, sworn to Apr. 27, 2007 (the "LeSueur Decl.") at Ex. A & B) (ECF Doc. # 65.) The first, Exhibit A, deals primarily with economic and business matters. The Petitioners have failed to provide a foundation for its admissibility; I see none, and it will not be considered. Cf. Schwimmer v. Sony Corp. of Am., 637 F.2d 41, 45 n.9 (2d Cir. 1980) ("A hearsay affidavit is a nullity on a motion for summary judgment.").

The second, Exhibit B, is the section of the Country Reports on Human Rights Practices – 2006 that deals with Argentina. Under Bridgeway and Perry H. Koplik, the Country Report is admissible. Without distinguishing, however, between the admissible Country Report and the inadmissible economic report, the Petitioners' supplemental memorandum of law refers to bombings and violent protests against businesses, and

emphasizes that "judicial officers have been found to be inefficient, subject to political manipulation, and incapable of stemming corruption." (Supplemental Memorandum of Law in Opposition to Motion of Compañia de Alimentos Fargo, S.A. to Dismiss Involuntary Chapter 11 Petition, dated Apr. 27, 2007 (the "Petitioners' Supp. Memo") at 9-10) (ECF Doc. # 66.) The Petitioners then leap to the following conclusion: "It is not inconceivable that these biases are at work in the concurso proceedings and lurk behind Panel B's unprecedented [March 4, 2005] ruling denying Noteholders the right to vote in those proceedings." (Id. at 10.)

The Country Report cited by the Petitioners paints a far more positive picture of the Argentine judiciary. In fact, it states that "[t]here is an independent and impartial judiciary in civil matters." (LeSueur Decl. Ex. B at 6.) Furthermore, while a historically ineffective and politicized judicial system has made it difficult to root out government corruption in a systemic fashion, the status quo appears to be changing: The government has continued to pursue anti-corruption measures, and a federal judge recently indicted several former high-ranking government officials. (Id. at 9.) In short, the Petitioners have failed to offer evidence that the Argentine courts in general, and the Fargo bankruptcy court in particular, are corrupt or subject to manipulation. Their entire argument comes back to the inference of corruption they ask me to draw from the March 4, 2005 Ruling.

Lastly, the Petitioners point out several differences between Argentine and United States bankruptcy law. As noted, the automatic stay does not apply to a debtor's secured creditors, or affect their rights. Furthermore, Argentine law does not provide for the equitable subordination of claims. Finally, under Argentine law, there is no broad right

to discovery akin to what is available under Federal Bankruptcy Rule 2004.  (Petitioners'
Supp. Memo at 6-8.)  A foreign bankruptcy system need not, however, "mirror" United
States law for comity to be granted, so long as foreign law is substantially similar and not
repugnant to United States law.  Cf. Bank of N.Y. v. Treco (In re Treco), 240 F.3d 148,
158 (2d Cir. 2001) (discussing former § 304(c)(4)); In re Ionica PLC, 241 B.R. 829, 836
(Bankr. S.D.N.Y. 1999) (same); In re Brierley, 145 B.R. 151, 165-166 (Bankr. S.D.N.Y.
1992) (same).  Moreover, the inquiry is a focused one, and the Petitioners must show that
the Concurso treats their interests in a manner that is fundamentally unfair and repugnant
to United States law and policy.  Cf. Treco, 240 F.3d at 158 (discussing former §
304(c)(4)).

Although the Petitioners have identified differences with United States law, they
have failed to show that these differences are at odds with our own fundamental notions
of fairness or treat them unfairly.  They also overstate the differences.  For example, it is
true that the automatic stay does not apply, in the first instance, to Bismark's secured
claim, and Bismark is, therefore, free to foreclose its security interests.[5]  It is equally true
that United States law does not grant unconditional protection to the debtor, and the
secured creditor can seek relief from the automatic stay for cause, including lack of
adequate protection of its interests.  See 11 U.S.C. § 362(d)(1).  In addition, under § 24 of
the Argentine Insolvency Law, the court may enjoin a foreclosure for up to 90 days "if
there is an evident need and emergency for the continuance of the debtor's business and
protection of the creditor's interest."  (Dasso Decl. at ¶ 12; accord Supp. Lorente Decl. at
¶ 6, p. 5.)

---

[5]      The Petitioners' focus on the automatic stay is not without irony.  They filed this involuntary case
in violation of the Argentine automatic stay.  (Supp. Lorente Decl. at ¶ 11, p. 11.)

In fact, Argentina's treatment of and rights afforded to secured creditors are similar to United States law prior to 1974. Former chapter XI of the repealed Bankruptcy Act of 1898, as amended, only dealt with unsecured debt; a debtor could not "arrange" the rights of secured creditors. 8 LAWRENCE P. KING, COLLIER ON BANKRUPTCY ¶ 2.06, at 75, ¶ 2.07[3], at 77 (14th ed. 1978). In addition, although American bankruptcy courts had the discretion to grant stays, the bankruptcy stay did not become <u>automatic</u> until the advent of the Rules of Bankruptcy Procedure. <u>Id.</u> ¶ 3.20[3], at 234-35. Rule 11-44, the chapter XI automatic stay, was promulgated in 1973 and became effective on July 1, 1974. <u>See</u> Lawrence P. King, <u>The History and Development of the Bankruptcy Rules</u>, 70 AM. BANKR. L.J. 217, 227 n. 63 (1996); Erin Y. Baker, <u>The Automatic Stay in Bankruptcy: An Analysis of the Braniff Chapter 11 Proceeding</u>, 14 TEX. TECH. L. REV. 433, 435 n. 14 (1983). While United States law has changed, no one maintains that the pre-1974 chapter XI law violated public policy or was repugnant to our notion of fundamental fairness.

Furthermore, although an American bankruptcy court can authorized broad discovery under Federal Bankruptcy Rule 2004, an Argentine bankruptcy court can also authorize discovery. (<u>Lorente Decl.</u> at ¶¶ 49, 53.) The Petitioners' own efforts in Argentina bear this out. The Petitioners filed a motion to suspend foreclosure by Bismark, and to commence an investigation into the relationship between Fargo's special secured creditor and its shareholder. The motion to stay the foreclosure was unsuccessful, but the General Trustee supported the Petitioners' request to authorize an investigation. That investigation is underway, and the Petitioners are participating in it. (<u>See</u> <u>Second Declaration of Lynette C. Kelly in Support of Motion of Compañía de</u>

Alimentos Fargo, S.A. to Dismiss Involuntary Chapter 11 Petition, dated Mar. 14, 2007 at Ex. A) (ECF Doc. # 54.)  In addition, Fargo contends that it has complied with all of the Petitioners' requests for information to date, both through the Concurso and through a stipulation, and has provided the Petitioners with financial and operational information and documentation.  (Response And Objection Of Compañía de Alimentos Fargo, S.A. To Motion Of Petitioning Creditors To Conduct 2004 Examinations, dated Nov. 29, 2006 at 9-10) (ECF Doc. # 34.)  Grupo Bimbo and Bimbo de Argentina also signed a confidentiality agreement with the Petitioners under which they have agreed to disclose information.  (See Objection of Pierre Acquisition, LLC, Bismark Acquisition, LLC and Madera, LLC to the Motion of Petitioning Creditors to Conduct 2004 Examinations, dated Nov. 29, 2006 at ¶ 15) (ECF Doc. # 26.)

Finally, the Petitioners complain that equitable subordination is not available in Argentina.  Equitable subordination is remedial.  ABF Capital Mgmt. v. Kidder Peabody & Co. (In re Granite Partners, L.P.), 210 B.R. 508, 517 (Bankr. S.D.N.Y. 1997); Ionica PLC, 241 B.R. at 836-37.  Although the precise remedy may not be available, Argentine law provides other remedies for improper conduct by corporate fiduciaries, and the Argentine bankruptcy court has the power to avoid fraudulent and preferential transfers that occurred within 24 months before the filing of the petition.  (Lorente Decl. at ¶¶ 57-59.)  Finally, the Argentine court can disqualify the votes of collusive, hostile and obstructing creditors.  (Dasso Decl. at ¶ 45.)

Here, the Petitioners contend that Chico Pardo, Grupo Bimbo and their affiliates acquired Fargo's secured debt and equity, commandeered the bankruptcy, and promoted their personal interests at the expense of the creditors'.  The Argentine court authorized

an investigation and discovery, and has the power to rectify the harm caused by any wrongdoing.

One other concern raised by the Petitioners relates to the pace of the Argentine proceedings.  The Petitioners argue, with some force, that the Concurso has dragged on.  It was commenced in 2002, and five years later, there is still no approved plan.  The stays granted by the Argentine courts, while the voting issue wended its way through the legal system, are the reason.  The stay-induced delays, however, now appear to be over.  The parties have been directed to report to the Supreme Court on a regular basis, and if the Waiver motion is denied, the appeal will presumably go forward.  Furthermore, as discussed in the next section, it is questionable whether a United States bankruptcy would move any more quickly or serve any purpose.  Based on the foregoing, the Court concludes that the Argentine courts can determine and adjust the parties' rights in a fair and equitable manner, and these factors weigh in favor of abstention.

**B.      The Pursuit of a Parallel Chapter 11 Case**

A parallel chapter 11 case would be inefficient and without any benefit, save one discussed in the next section.  In making a determination about the economy and efficiency, courts consider, inter alia, the physical location of the parties in interest, the existence of parallel actions, and the nature of the dispute.  In re L & M Video Prods., Inc., No. 07-31798, 2007 WL 1847387 at *6 (N.D. Ohio  June 25, 2007) (abstaining due to the existence of a state receivership that had been pending for "over two years" and would have finally disposed of the debtor's assets had the debtor not filed a bankruptcy petition); Multicanal, 314 B.R. at 522 (abstaining because a parallel restructuring in Argentina was nearly complete and the maintenance of another proceeding would be

21

"costly and time-consuming"); In re Spade, 258 B.R. 221, 236  (Bankr. Colo.), aff'd., 269

B.R. 225, 228 (D. Colo. 2001) (abstaining because the dispute in the bankruptcy court is

actually a "two-party case", and thus bankruptcy would only add an "additional layer of

expense"); cf. Paper I Partners, 283 B.R at 679 (finding that economy and efficiency are

served by a bankruptcy proceeding in New York when the debtor's general partner was

located in New York and when the creditors picked the bankruptcy court in New York,

because "creditors need not go around the country or the world to obtain relief").

Fargo's business operations, customers and employees are located in Argentina.

Its United States assets are limited to one trademark and three trademark applications.  In

the main, the wrongful conduct alleged by the Petitioners against Fargo's special secured

creditor, indirect shareholder and their affiliates relate to the Concurso, and will be

judged under Argentine law.  The Argentine bankruptcy court appears to have

jurisdiction over all of Fargo's creditors; in contrast, this Court may not have, or at a

minimum, may have to deal with challenges to its jurisdiction.  An attempt by this Court

would certainly be difficult if not futile.  Multicanal, 314 B.R. at 523 (discussing the

objective futility of an involuntary proceeding against an Argentine debtor who opposed

the chapter 11 case, had minimal assets in the United States and whose principals had no

nexus to the United States); see Globopar, 317 B.R. at 253-54 (noting, in dicta, that the

potential lack of cooperation from the debtor, its foreign creditors and the local courts

"may well weigh heavily in the Bankruptcy Court's assessment of factors enumerated by

Section 305(a)(1) of the Bankruptcy Code").

Perhaps more importantly, the Petitioners fail to explain what a confirmed chapter

11 plan would accomplish.  As noted, Fargo has no business or assets in the United States

to reorganize. Instead, someone would have to take the confirmed plan to Argentina, and ask the local courts to grant comity to the chapter 11 plan. The Petitioners' expert suggested two ways to accomplish this: (1) present the chapter 11 plan as the Argentine plan, and solicit the necessary creditor approval under Argentine law (Dasso Decl. at ¶¶ 93-97), or (2) withdraw the Concurso, and present the confirmed chapter 11 plan as an acuerdo preventivo extrajudicial ("APE"). (Id. at ¶¶ 98-103.)

Fargo's expert was less sanguine about either possibility, and noted several obstacles. One overarching problem concerns the Petitioners' own disregard of Argentine law. They violated the Argentine stay when they filed the involuntary case, and because of the violation, the Argentine courts will not enforce or give effect to orders of this Court. In addition, the dual track proceedings proposed under the Petitioners' first alternative ignores differences between United States and Argentine law. The classification and treatment of creditors under the two sets of laws differ somewhat, making it unlikely that the Argentine court will simply accept the chapter 11 plan as the Argentine plan, and approve it. For example, the Petitioners apparently aim to equitably subordinate Bismark's secured claim and invalidate its lien. See 11 U.S.C. § 510(c). If this Court subordinates Bismark's claim, it will have to be separately classified under any chapter 11 plan. Argentina does not recognize equitable subordination, and an Argentine plan cannot include a separate class of subordinated claims. In addition, the debts that arose between the filing of the Concurso and the chapter 11 case would be treated as post-petition debt in the Concurso but pre-petition debt in the chapter 11. Finally, an Argentine court cannot cede its exclusive statutory jurisdiction over Fargo's assets, business and creditors to this Court. (See Supp. Lorente Decl. at ¶¶ 12-17.)

The proposed APE route, the second alternative, suffers from the same problems plus some others.  The post-petition claims in the withdrawn <u>Concurso</u> would be pre-petition debt in the APE; post-petition interest, suspended during the <u>Concurso</u>, would become enforceable pre-petition debt in the APE; once the <u>Concurso</u> is withdrawn, and until the APE is accepted, Fargo would lose the benefit of the statutory stay; and the withdrawal of the <u>Concurso</u> may trigger a bar to the immediate refilling of an APE.  (<u>Id.</u> at ¶¶ 18-23.)

It is unnecessary to resolve the disagreements between the two experts, although Fargo's expert evidently gave more thought to the Petitioners' proposal than their own expert did.  Suffice it to say, the successful enforcement of a chapter 11 plan in Argentina would amount to an undertaking fraught with uncertainty.  Under the circumstances, the reorganization of a Fargo would undoubtedly be time-consuming and expensive, and provide a questionable benefit.  These factors weigh in favor of abstention.

## C.    The Purpose of the Filing

According to the Petitioners, they filed the involuntary petition "after enduring four years of a convoluted insolvency process in Argentina that has been hijacked in a hostile takeover scheme" and "to help maximize the value of Fargo and the recovery of Noteholder claims and to further facilitate the restructuring of Fargo."  (<u>2004 Application</u> at 2).  Yet they bought into the <u>Concurso</u> despite its problems.  Three of the Petitioners purchased substantial amounts of Notes after the March 4, 2005 Ruling.[6]  (<u>See</u>

---

[6]    One of the two declarations executed on September 11, 2006 and attached to the Involuntary Petition stated that Rainbow Global High Yield Fund purchased $8.5 million of Notes (face amount) on February 16, 2006.  (<u>Involuntary Petition, Declaration of Pierre Naim Pursuant to Bankruptcy Rule 1003(a) in Support of the Involuntary Petition Filed Against Compañía de Alimentos Fargo S.A.</u>, sworn to Sept. 11,

Involuntary Petition at Attachment B).   In fact, Argo Capital Management held $7,355,000 in Notes on March 3, 2005 (Declaration of Mark Slater in Support of Petitioners' Opposition to Fargo's Motion to Dismiss, sworn to Feb. 13, 2007 at ¶ 2) (the "Slater Decl.") (ECF Doc. # 49), $27,585,000 on September 11, 2006 (Involuntary Petition, Declaration of Kyriakos Rialas Pursuant to Bankruptcy Rule 1003(a) in Support of the Involuntary Petition Filed Against Compañía de Alimentos Fargo, S.A., sworn to Sept. 11, 2006, at ¶ 2), and $34,760,000 on February 13, 2007.  (Slater Decl. at ¶ 3.)  The Petitioners' contrary protests notwithstanding, they were not overly concerned with fairness of the Argentine proceeding or the ability to get paid through the Concurso.

Indeed, one could argue, with equal plausibility, that the Petitioners filed this case to hijack the Concurso or, at a minimum, increase their leverage in any negotiations. Although the prospect for or benefits of a confirmed chapter 11 plan have always been doubtful, the Petitioners triggered the automatic stay under § 362(a) of the Bankruptcy Code merely by filing the involuntary petition.  Fargo's property may be located in Argentina,[7] but its secured creditor, Bismark (like Pierre and Madera), is a Delaware limited liability company subject to this Court's jurisdiction.  (Objection of Pierre Acquisition, LLC, Bismark Acquisition, LLC and Madera, LLC to the Motion of Petitioning Creditors to Conduct 2004 Examinations, at ¶ 10).  If Bismark attempted to interfere with or obtain control of its collateral without receiving relief from the

---

2006 at ¶ 2.)  The documentation attached as Exhibit A to the declaration showed that the purchases were made a year earlier, in February 2005.  (Involuntary Petition at Ex. A).

[7]      Under the United States law, the filing of the involuntary petition gave this Court exclusive jurisdiction over Fargo's Argentine property, see 28 U.S.C. § 1334(e), an exclusive jurisdiction it "shares" with the Argentine court.  As a practical matter, the Argentine court will deal with the Argentine property.

automatic stay under 11 U.S.C. § 362(d), it could be punished for the violation.[8]  If

nothing else, the pending involuntary case automatically stayed Bismark, something

Argentine law did not do.  For this reason, the Petitioners argued at the last hearing that

the Court should suspend rather than dismiss the involuntary case, leave the automatic

stay in place, and take another look at the progress in Argentina in the future.  (See Tr.

(8/27) at 13.)  In other words, they want me to oversee the Argentine bankruptcy.

I decline the invitation.  The automatic stay is not an end unto itself, but a

protection a debtor gets to allow it to reorganize.  If the reorganization serves no purpose,

the automatic stay cannot give it a purpose.  For the reasons already discussed, Fargo

should be reorganized in Argentina – without this Court's oversight or interference.

Thus, even if I give the Petitioners the benefit of the doubt, and assume that they filed the

involuntary petition for noble reasons, the other relevant factors weigh heavily in favor of

abstention, and I will exercise my discretion to do so.  Accordingly, Fargo's motion for

summary judgment dismissing the involuntary case under 11 U.S.C. § 305(a)(1) is

granted.  The Court has considered the Petitioners' other arguments, and concludes that

they lack merit.  Settle order on notice.

Dated: New York, New York
       October 12, 2007

         /s/  *Stuart M. Bernstein*
            STUART M. BERNSTEIN
       Chief United States Bankruptcy Judge

---

[8]       The Argentine property is "property of the estate" see 11 U.S.C. § 541(a), and although located in
Argentina, is protected by the American automatic stay.